UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

EXPERIENCE HENDRIX, LLC., a Washington
Limited Liability Company; and AUTHENTIC
HENDRIX, LLC., a Washington Limited Liability
Company,

                        Plaintiffs,

vs.

ELECTRIC HENDRIX, LLC., a Washington
Limited Liability Company; ELECTRIC
HENDRIX APPAREL, LLC., a Washington
Limited Liability Company; ELECTRIC
HENDRIX LICENSING LLC., a Washington
Limited Liability Company; and CRAIG
DIEFFENBACH, an individual,

                        Defendants.

NO.  C07-0338 TSZ

ORDER

This case comes before the Court on Defendants' Motion for Summary Judgment, docket no. 64, Plaintiffs' Motion for Partial Summary Judgment, docket no. 71, and Plaintiffs' Motion for Summary Judgment Dismissing Counterclaims, docket no. 73.  The Court heard oral argument on these motions on July 11, 2008, and took the matter under advisement.  The Court, being fully advised, now enters this Order.  The Court now DENIES Defendants'

Motion for Summary Judgment, docket no. 64, GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Partial Summary Judgment, docket no. 71, and GRANTS Plaintiffs' Motion for Summary Judgment Dismissing Counterclaims, docket no. 73.

## BACKGROUND

This case involves the ongoing and expensive litigation saga between two factions of the Jimi Hendrix family. In this lawsuit, the Authentic Hendrix and Electric Hendrix companies run by Janie Hendrix (Jimi Hendrix's stepsister) (collectively "Authentic Hendrix" or "Plaintiffs") are suing Craig Dieffenbach individually and the companies formed by Craig Dieffenbach, (collectively "Hendrix Electric" or "Defendants"), for infringement of Plaintiffs' trademarks in connection with selling, bottling, and marketing vodka as "Hendrix Electric," "Jimi Hendrix Electric," or "Jimi Hendrix Electric Vodka." Am. Compl., docket no. 23, at 5. The Amended Complaint, filed May 23, 2007, also alleges unfair competition, trademark dilution, violations of the Washington Consumer Protection Act, contributory infringement, unjust enrichment and constructive trust. Am. Compl., at 25-37.[1]

Jimi Hendrix died intestate in 1970 in London, England, and his estimated $80 million estate went to his father, Al Hendrix, according to the intestate laws of New York. In 1995, Al Hendrix established and incorporated Experience Hendrix LLC and Authentic Hendrix LLC, and by written agreements, Al Hendrix assigned his rights, personally and as sole heir to the estate of Jimi Hendrix, to Plaintiffs. Experience Hendrix LLC Agreement, docket no. 65, ex. 3, ¶ 4.1.1; Authentic Hendrix LLC Agreement, docket no. 65, ex. 4, ¶ 4.1.1. Plaintiffs now license and sell Jimi Hendrix related products, including Jimi Hendrix music, as well as

---

[1] The present motions which are the subject matter of this Order do not address Plaintiffs' claims for unfair competition, claims under the Consumer Protection Act, or for unjust enrichment or constructive trust. In addition, although the various motions addressed various "contestable" marks including JIMI HENDRIX for use on a wide range of goods, ELECTRIC LADYLAND, and a Jimi Hendrix signature, the Court is unable to resolve the motions as a matter of law relating to these contestable marks.

branded T-shirts, guitars, guitar accessories, and posters. Wilson Decl., docket no. 74, exs. D, K (examples of licensed products). Plaintiffs also operate a web site where Jimi Hendrix goods are sold. Id. [2]

Defendant Dieffenbach has a relationship with the Jimi Hendrix family through Jimi's brother, Leon Hendrix. Dieffenbach Decl., docket no. 65, ex. 16, ¶ 3 (attached to Taylor Decl., docket no. 65) ("Dieffenbach Decl."). Mr. Dieffenbach helped underwrite the James Marshall Hendrix Foundation ("the Foundation") which Leon Hendrix founded. Id. Mr. Dieffenbach also assisted Leon Hendrix in preserving the original Jimi Hendrix family home when it was in danger of being torn down. Id. ¶ 2. Dieffenbach is the CEO of Electric Hendrix and Electric Hendrix Spirits, Limited Liability Companies.

Mr. Dieffenbach has had previous litigation with Plaintiffs when Plaintiffs sued the Foundation and certain individuals including Mr. Dieffenbach over the use of Jimi Hendrix's name, in case number C03-3462-TSZ. Id. ¶ 1. In that case, the defendants moved for partial summary judgment on the publicity right claims plaintiffs had asserted. This Court granted the motion for partial summary judgment and held that "no right of publicity descended to Al Hendrix in 1970." Order, docket no. 47, C03-3462-TSZ ("the Foundation Order"). The plaintiffs then dismissed the remaining claims and appealed the grant of partial summary judgment and an award of attorney's fees. See docket for C03-3462-TSZ. The Ninth Circuit affirmed both the grant of partial summary judgment and the award of attorney's fees. Experience Hendrix LLC v. James Marshall Hendrix Found., 240 Fed.Appx. 739 (9th Cir. 2007) (unpublished opinion).

---

[2] See also http://www.authentichendrix.com

ORDER - 3

In late 2005, Mr. Dieffenbach filed trademark registration applications for JIMI HENDRIX ELECRIC, JIMI HENDRIX ELECTRIC VODKA, HENDRIX ELECTRIC VODKA, HENDRIX ELECTRIC, and a design featuring a Jimi Hendrix likeness with and without "Jimi" written over a portion of the hair ("the Electric marks"). Dieffenbach Decl., ¶ 6; Trademark Record, docket no. 65, ex. 18; Taylor Decl., docket no. 65, ex. 15, 15-17. Dieffenbach also filed applications to register Hendrix, Jimi Hendrix, Electric Bar and Jimi Hendrix Café for a variety of services and products with the United States Patent and Trademark Office. Dieffenbach Decl. ¶ 9. Ultimately Defendants abandoned any efforts to expand into these areas and decided to concentrate on Vodka sales. Id. at ¶ 10. Defendants' trademark applications were sold to a third party and the applications lapsed. Dieffenbach Decl. ¶ 6.

Plaintiffs own at least 48 registered trademarks including the following five marks that have become incontestable (collectively the "incontestable marks"):

(1) AUTHENTIC HENDRIX, registration no. 2,245,408, for online ordering services of music, apparel, and memorabilia related to the music industry;

(2) EXPERIENCE HENDRIX registration no. 2,245,409, for print materials such as magazines and posters regarding the music industry;



(3) The design  ("AUTHENTIC HENDRIX BUST") registration no. 2,250,912, for use on musical sound recordings;

(4) JIMI HENDRIX, registration no. 2,245,408, for use on clothing such as T-shirts, jackets, and caps; and

ORDER - 4

(5) JIMI HENDRIX registration no. 2,322,761, for use in entertainment services. Second Wilson Decl., ex. B.

Plaintiffs' contestable marks which have been registered for less than 5 years include, in summary:

(1) Variations of the AUTHENTIC HENDRIX BUST, for use on a number of products including ceramic tiles, key chains, afghans, printed matter, etc.;

(2) ELECTRIC LADYLAND for use on air fresheners, books, key chains, etc.;

(3) HENDRIX and JIMI HENDRIX on compact discs, stickers, key chains, T-shirts, buttons, watches, wall clocks, entertainment services, etc.;

(4) The design  ("AUTHENTIC HENDRIX SIGNATURE") for use on printed matter, key chains, clothing, sports bottles, and entertainment services;

(5) JIMI HENDRIX ELECRIC GUITAR COMPETITION and JIMI HENDRIX ELECTRIC GUITAR FESTIVAL for use on posters and pins; and

(6) The design  ("AUTHENTIC I AM EXPERIENCED") for use on online retail store services. Id.

Plaintiffs' contend that the following unregistered marks used by Defendants infringe Plaintiffs' incontestable marks as follows:

(1) JIMI HENDRIX ELECTRIC, JIMI HENDRIX ELECTRIC VODKA, HENDRIX ELECTRIC, and HENDRIX ELECTRIC VODKA for distilled spirits excluding gin; and

(2) The design  for distilled spirits excluding gin (with and without Jimi signature); Dieffenbach Decl., ¶ 6; Trademark Record, docket no. 65, ex. 18; Dieffenbach Deposition, docket no. 65, ex. 15, 11-17.

The Electric marks were used on vodka and promotional material such as shot glasses and T-shirts.  First Wilson Decl., docket no. 72-3, ex. B, 44:3-9, 101:8-13 (Mele Deposition).[3]

## DISCUSSION

Plaintiffs have moved for summary judgment seeking a declaratory judgment that Defendants have infringed Plaintiffs' marks.  Plaintiffs also seek to have Defendants' counterclaims dismissed as a matter of law.  Defendants have moved for summary judgment and seek a declaratory judgment of no infringement, no trademark dilution, no contributory infringement, and no damages.  Defendants also move for summary judgment on their defense of unclean hands.

Summary judgment is appropriate when there is no dispute of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317 (1990).   When a properly supported motion for summary judgment has been presented, the adverse party "may not rest upon the mere allegations or denials" of its pleadings.  Fed. R. Civ. P. 56(e).  The non-moving party must set forth "specific facts" demonstrating the existence of a genuine issue for trial.  Id.; Anderson v.

---

[3] There are two Wilson declarations, the first declaration is in support of Plaintiffs' motion for summary judgment of infringement, ("First Wilson Decl.") at docket no. 72, and the second is in support of Plaintiffs' motion for summary judgment dismissing counterclaims, ("Second Wilson Decl.") at docket no. 74.

Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Only admissible evidence can be considered at the summary judgment stage. Fed. R. Civ. Proc. 56(e)(1). Conclusory or speculative affidavits are not sufficient to raise a genuine issue of material fact. Soremekun v. Thrifty Payless, 509 F.3d 978, 984 (9th Cir. 2007); Thornhill Pub. Co., Inc. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).

## I. Publicity Rights

A threshold issue in this case is what effect the Foundation Order has on Plaintiffs' trademark rights. The Foundation Order held that on Jimi Hendrix's death his publicity (privacy) rights expired and did not pass to Al Hendrix. Publicity Rights under New York law are governed by New York Civil Rights Law § 51. The primary thrust of Defendants' arguments is that because the Jimi Hendrix publicity rights expired, Plaintiffs could not seek trademark protection for the use of the name or likeness of Jimi Hendrix.

Defendants contend that the effect of the Foundation Order was to foreclose any possibility of Plaintiffs asserting rights in the name or likeness of Jimi Hendrix, including those derived from trademarks based on Jimi Hendrix's fame. The Foundation Order does not compel this result. The Foundation Order can only be read to say that no rights in the commercial value of Jimi Hendrix's name, likeness or other indicia of identity descended to Plaintiffs by operation of New York law.

Trademark rights and publicity rights are distinct rights that are analyzed under different standards. See U. of Notre Dame Du Lac v. J.C. Gourmet Food Imps. Co., Inc., 703 F.2d 1372, 1376 (Fed. Cir. 1983) ("Our review of case law discloses that the elements of a claim of invasion of one's privacy have emerged as distinctly different from those of trademark or trade name infringement."); Nova Wines, Inc., v. Alder Fels Winery LLC, 467 F.Supp.2d

965, 976-77 (N.D. Cal. 2006) (holding that a trademark does not protect all uses of the image of a celebrity for use in commerce, where a right of publicity may).  The inquiry under a right of publicity action is whether there was a commercial appropriation of one's identity without consent.  See J. Thomas McCarthy, The Rights of Publicity and Privacy § 1:3 (2d ed. 2008).  The proper inquiry when analyzing a trademark right in a famous name is whether the mark in question will falsely suggest a connection with the famous person.  15 U.S.C. § 1052(a).  The right of publicity or privacy under state law is not necessary to acquire valid trademark rights under federal law.  The Court must therefore analyze Plaintiffs' trademark claims under federal law.

## II.    **Plaintiffs' Trademarks**

The Lanham Act allows the holder of a protectable trademark to prevent unauthorized persons from, "use[ing] in commerce any . . . registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services" which is likely to cause confusion.  15 U.S.C. § 1114(1)(a).  Plaintiffs must prove two elements for their trademark claims: (1) ownership of a valid trademark, and (2) Defendants' use of a similar mark which is likely to cause customer confusion.  15 U.S.C. §§ 1114(1)(a), 1114(1)(b); Tie Tech, Inc. v. Kinedyne Corp., 296 F.3d 778, 783 (9th Cir. 2002) (plaintiff must own a valid trademark); Thane Int'l, Inc. v. Trek Bicycle Corp., 305 F.3d 894, 900 (9th Cir. 2002) (plaintiff must prove that defendant's similar mark causes customer confusion).  Plaintiffs' ownership of its registered marks is presumed by registration of the marks and is not disputed by Defendants. 15 U.S.C. § 1057(b).

Trademarks are traditionally a word, phrase, or graphic design used to identify the origin of goods or the sponsorship of goods.  Mattel, Inc. v. MCA Records, Inc., 296 F.3d 894, 900

(9th Cir. 2002). The law permits the use of the name of a person as a trademark. <u>Stephano Bros. v. Stamatopoulos</u>, 238 F. 89, 93 (2nd Cir. 1916); <u>See also</u> J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u>, § 13.1 (4th Ed. 2008).[4] Defendants cannot seriously challenge this legal principle. In fact, Defendants have attempted to register marks using the Hendrix name and image. Dieffenbach Decl.; Taylor Decl., ex. 18.

## A. <u>Validity of Plaintiffs' Incontestable Trademarks</u>

Registration of a trademark establishes prima facie evidence of the validity of the mark, and of the registrant's exclusive ownership of the mark and right to exclusive use of the mark in commerce, subject to the goods or services listed in the registration and any conditions or limitations noted on the registration. 15 U.S.C. § 1057(b). A registered trademark provides a presumption of validity that shifts the burden to the alleged infringer to prove otherwise. <u>Tie Tech, Inc. v. Kinedyne Corp.</u>, 296 F.3d 778, 782-83 (9th Cir. 2002).

A registration becomes "incontestable" if the applicant files an affidavit with the United States Patent and Trademark Office ("PTO") stating that the mark has been in continuous use for five consecutive years subsequent to the date of the registration and is still in use in commerce. 15 U.S.C. § 1065. The validity of an incontestable mark may not be challenged except on the grounds that it is generic, it has been abandoned, it is fraudulently used by the registrant, or it was obtained fraudulently. 15 U.S.C. § 1065; <u>Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.</u>, 469 U.S. 189, 195 (1985). Plaintiffs filed the necessary and timely affidavit with the PTO relating to each incontestable mark. <u>See</u> Taylor Decl., ex. 37.

---

[4] There are many examples of famous names or images being registered as trademarks under federal law. <u>See Ex Parte Crockett Seafood Inc.</u>, 114 USPQ 508 (TTAB 1957) (registration of 'Davy Crockett' for seafood products); <u>Estate of Presley v. Russen</u>, 513 F.Supp. 1339 (D.N.J. 1981) (image of Elvis Presley as a service mark); <u>Pirone v. Curtis Mgmt. Group, Inc.</u>, 894 F.2d 579 (2d. Cir. 1990) (mark for 'Babe Ruth' even where the right of publicity did not exist); <u>Nova Wines, Inc., v. Adler Fels Winery LLC</u>, 467 F.Supp.2d 965 (N.D. Cal. 2006) (valid trade dress trademark image of 'Marilyn Monroe' on wine bottles). See other examples at Exhibit F of First Wilson Decl. docket no. 72.

Five of Plaintiffs' marks have attained incontestable status under 15 U.S.C. § 1065: AUTHENTIC HENDRIX, EXPERIENCE HENDRIX, the AUTHENTIC HEDRIX BUST, and both uses of JIMI HENDRIX. At oral argument, Defendants conceded that Plaintiffs had a sufficient connection to Jimi Hendrix to register these trademarks, and that by operation of law these five incontestable marks are deemed to have acquired secondary meaning. Defendants' attacks on these incontestable marks as merely descriptive surnames fail as a matter of law because incontestable marks are deemed to have acquired secondary meaning for purposes of validity. See Park 'N Fly, 469 U.S. at 205. Secondary meaning is an association between the mark and the source or sponsor of goods in the minds of consumers such that the mark becomes distinctive of the source or sponsorship of the goods. 15 USC § 1052(f); E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1291 (9th Cir. 1992). Defendants attack Plaintiffs' incontestable marks under three additional theories: fraud on the PTO, abandonment of the marks, and unclean hands.

### i. **Fraud on the PTO**

Defendants claim that Plaintiffs made fraudulent representations to the PTO in order to allow registration of Plaintiffs' trademarks. Plaintiffs' initial registration for the HENDRIX trademark was rejected by the Examiner because the Examiner, not knowing of any connection between Plaintiffs and Jimi Hendrix, believed the registration falsely suggested a connection between Plaintiffs' products and the estate of Jimi Hendrix. Taylor Decl., docket no. 78 ex. 37, at 24. Jimi's sister, Janie Hendrix, submitted an affidavit in response stating:

> "My father, James A. Hendrix, was . . . the sole heir of Jimi Hendrix's estate.
> He later transferred his rights in and to the legacy of Jimi Hendrix to
> Experience Hendrix, L.L.C. and Authentic Hendrix L.L.C. . . . .
> Experience Hendrix, L.L.C., therefore, is the successor owner of rights passed
> to my father from Jimi Hendrix's estate, including registered United States
> copyrights in Jimi Hendrix's musical and other works, trademarks, sound

recordings, and visual recordings, which it licenses throughout the world. Experience Hendrix, L.L.C. consents to the registration of the Mark in this application."

Id. at 29.

The PTO subsequently issued the registration. Id. at 8. Defendants claim that the Janie Hendrix declaration made to the PTO was false and that Plaintiffs intentionally mislead the trademark examiner because Plaintiffs did not have exclusive rights to all the uses of the Jimi Hendrix name and because there were no trademarks that passed on to Al at Jimi's death.[5]

Once a trademark has been issued, a party seeking cancellation of that mark must prove any alleged fraud on the PTO by clear and convincing evidence. L.D. Kichler Co. v. Davoil, Inc., 192 F.3d 1349, 1351 (Fed. Cir. 1999). "Fraud in procuring a mark occurs when an applicant knowingly makes false, material representations of fact in connection with an application." Quiksilver, Inc. v. Kymsta Corp., 466 F.3d 749, 755 (9th Cir. 2006) (quoting L.D. Kichler Co., 192 F.3d at 1351). It is not enough to merely prove that a statement was false; the statement must also be material and known to be false. L.D. Kichler Co., 192 F.3d at 1351.

When questioned at oral argument, Defendants were unable to point to any particular portion of the Janie Hendrix declaration that was materially false. Defendants asserted that because Defendants were not aware of any trademarks that passed from Jimi Hendrix to Al Hendrix, Janie Hendrix's statement that trademarks had passed to Al Hendrix upon Jimi's death was fraudulent. During oral argument, Plaintiffs countered that there were at least common law trademarks that passed to Al Hendrix and that all the statements in the

---

[5] Defendants also assert that Plaintiffs did not have a basis to claim exclusive rights to the trademark JIMI HENDRIX. Plaintiffs established a rebuttable presumption to the right to use the mark by producing the registration, and Defendants have not provided admissible evidence to show anything to the contrary.

declaration were true. Defendants have offered no evidence to prove either that Janie Hendrix knew the representation was false or that the representation was material to the consideration of the trademark registration, as Defendants were required to show to maintain a claim of fraud on the PTO.

Defendants have also failed to show that Plaintiffs should have brought the <u>Foundation</u> Order to the attention of the PTO. The lack of publicity rights does not prejudice a trademark application, so this fact was not material to the application. Given the clear and convincing evidence standard that is required to invalidate a trademark based on fraud on the PTO, the Court holds that this counterclaim fails as a matter of law.

## ii. <u>Abandonment of the Marks</u>

Defendants assert that Plaintiffs have abandoned their marks through "naked" licensing. A mark is abandoned when it no longer serves the purpose of indicating the source of goods. 15 U.S.C. § 1127.[6] A licensor who licenses a trademark without exercising any quality control over the licensed goods creates a so-called "naked" license. <u>Barcamerica Int'l USA Trust v. Tyfiled Imps., Inc.</u>, 289 F.3d 589, 595-96 (9th Cir. 2002). When such a naked license is created, a court may find that the licensor has abandoned the mark and the owner's rights may be terminated. <u>Id.</u> "[T]he law is well settled that there are no rights in a trademark alone and that no rights can be transferred apart from the business with which the mark has been associated." <u>E. & J. Gallo Winery</u>, 967 F.2d at 1289 (quoting <u>Mister Donut of America, Inc. v. Mr. Donut, Inc.</u>, 418 F.2d 838, 842 (9th Cir. 1969)). "Because a finding of insufficient control essentially works a forfeiture, a person who asserts insufficient control must meet a

---

[6] "A mark shall be deemed to be 'abandoned' . . . when any course of conduct of the owner, including acts of omission as well as commission, causes the mark . . . in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph." 15 U.S.C. 1127.

high burden of proof." <u>Transgo, Inc. v. Ajac Transmission Parts Corp.</u>, 768 F.2d 1001, 1017 (9th Cir. 1985).

Plaintiffs assert that they police the goods bearing their mark and cite instances of quality checks and prototype approval. In response to Defendants' interrogatories Plaintiffs identify the quality control process and procedures to ensure control of its marks. <u>See</u> Response to Interrogatory No. 2, First Wilson Decl., ex. I. Defendants point to deposition testimony that shows that more than one licensee was licensed for the same items, such as multiple Authentic Hendrix guitar pedal manufacturers and multiple keychain manufacturers. Multiple licensees, without more indications of lack of oversight, does not reasonably lead to an inference of lack of quality control. Defendants also point to deposition testimony that indicates that at least one function of reviewing a potential licensee's prototype is to check that the brand image is displayed correctly and that the item in question does not show Jimi in a bad light, such as associating him with drugs or alcohol or associating him with right-handed guitar playing. No inference can be drawn from Defendants evidence, however, that no other quality checks take place, and in fact the deposition testimony of Amanda Howell indicates that further testing is done by Janie Hendrix and all products are sent to Janie Hendrix for final approval.

The type of quality control required to prevent abandonment varies with the circumstances. <u>Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.-East</u>, 542 F.2d 1053, 60 (9th Cir. 1976). The court in <u>Edwin K. Williams & Co.</u> noted that a higher level of quality control would be expected when an item such as food might pose a danger to public safety, and a lower level of quality control might be acceptable in other circumstances. <u>Id.</u> at 1059-60. While Defendants point to an energy drink licensed by Authentic as an example of

lack of quality control, this drink was licensed under a trademark that was not involved in this suit. Whether Plaintiffs exercised quality control over an energy drink licensed under a trademark not asserted in this suit does not bear on the validity of any of the trademarks that are asserted in this suit.[7] Plaintiffs' depositions demonstrate testing methodologies they employ on products. Wilson Decl., ex. H. (Howell deposition). Plaintiffs also ship goods directly from their fulfillment center which puts Plaintiffs in a position between the manufacturer and consumer where quality can be monitored and checked. Second Wilson Decl., ex G, 101:18-21. On this record, Defendants have failed to provide evidence of a lack of quality control sufficient to constitute abandonment of Plaintiffs' marks.[8] The Court decides as a matter of law that Defendants' counterclaim based on naked licensing and lack of quality control is without merit and should be dismissed.

### iii. **Unclean Hands**

A plaintiff who seeks to enforce a trademark must be free of any false or misleading representations. Japan Telecom, Inc. v. Japan Telecom America, Inc., 287 F.3d 866, 870-71 (9th Cir. 2002). A defendant must show that a plaintiff's conduct is inequitable in relation to the subject matter of the claims. Id. Defendants accuse Plaintiffs of misrepresenting their ownership of Jimi Hendrix publicity rights in licensing attempts. Defendants rely on Plaintiffs' licensing letters sent to accused infringers stating that "Authentic Hendrix, LLC, manages and licenses all publicity personality rights in connection with [Jimi Hendrix's] name, likeness, image and signature on merchandise." Taylor Decl., ex. 10, at 1. All of the licensing letters provided in the exhibit, however, predate the Foundation Order. Id.

---

[7] See "THE JIMI HENDRIX LIQUID EXPERIENCE", Trademark registration applications serial nos. 77336912, and 77336917.
[8] Defendants contend that interrogatories about product quality relating to specific licensed merchandise were not answered, but no such discovery requests have been made part of the record.

Defendants' other unclean hands arguments relate to representations to the Trademark office and have been previously addressed in this Order. Defendants' counterclaim for unclean hands will also be dismissed.

**B. <u>Infringement</u>**

Trademark registrations are afforded varying levels of protections depending on the relative strength of the mark; a mark can be in order of increasing strength, generic, descriptive, suggestive, arbitrary, or fanciful. <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 768 (1992). Generic terms are not protectable, while descriptive marks may be protectable once they have acquired distinctiveness through a secondary meaning. <u>Park 'N Fly</u>, 469 U.S. at 194. A descriptive mark that has become incontestable cannot be invalidated on the grounds that it has failed to achieve secondary meaning. <u>Id.</u> at 205.

Trademark infringement of a plaintiff's mark occurs when a defendant's mark is used in commerce and that mark is likely to cause consumer confusion between plaintiff's and defendant's marks. 15 U.S.C. § 1114. The test for likelihood of confusion is the likely reaction of typical buyers including those who are ignorant, unthinking, and credulous. <u>Fleischmann Distilling Corp. v. Maier Brewing Co.</u>, 314 F.2d 149, 156 (9th Cir. 1963).

Likelihood of confusion is analyzed using the eight so-called <u>Sleekcraft</u> factors: (1) strength of the mark, (2) proximity or relatedness of goods, (3) similarity of the marks, (4) evidence of actual confusion, (5) convergence of marketing channels, (6) degree of care customers are likely to use when purchasing goods of the type in question, (7) intent of defendant in selecting the mark, and (8) likelihood the parties will expand their business lines. <u>White v. Samsung Electronics America, Inc.</u>, 971 F.2d 1395, 1400 (9th Cir. 1992). These factors are a non-exclusive set helpful in making an ultimate factual determination of the

likelihood of confusion, but they are not "requirements or hoops that a district court need jump through to make a determination." Eclipse Associates Ltd., v. Data General Corp., 894 F.2d 1114, 1118 (9th Cir. 1990).

### i. First Sleekcraft Factor: Strength of Plaintiffs' Marks

Trademark law seeks to promote identification of a good's source so that consumers can make an informed purchasing choice. Two Pesos, Inc., 505 U.S. at 784 n.19. Marks are given varying degrees of protection based on the strength of the mark, and the strength of the mark is determined by the ability to signify to the consumer the source or sponsorship of the goods. Id. at 767-68. Stronger marks are marks more likely to be remembered and associated by consumers with the mark owner, and stronger marks are given greater protection. Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1058 (9th Cir. 1999). An incontestable mark must still be analyzed to determine the strength of the mark.

Plaintiffs' marks all contain the name Hendrix. A person's name is a descriptive trademark and requires secondary meaning in order to be afforded trademark protection. Pirone v. MacMillian, Inc., 894 F.2d 579, 583 (2nd Cir. 1990). When analyzing the strength of a name used as a trademark, the particular facts of the name and the goods must be analyzed. See Scarves by Vera, Inc. v. Todo Imports Ltd., 544 F.2d 1167, 1173 (2nd Cir. 1976). A famous person's name may have secondary meaning if it is likely to be recognized by prospective purchasers.

> "If a mark consists of the name of an historical figure or other noted person and is likely to be recognized as such by prospective purchasers, secondary meaning ordinarily will not be required. Unless consumers are likely to believe that the named person is connected with the goods, services, or business, the use will be understood as arbitrary or suggestive. DA VINCI on jewelry, for example, is an inherently distinctive designation."

Restatement (Third) of Unfair Competition, § 14 cmt. e (citations omitted).

Whether Jimi Hendrix's name is likely to be recognized by prospective purchasers is not in dispute. Defendants admit that they chose to market Hendrix-related goods because of the recognition of the Hendrix name in the market place. <u>See</u> Electric Hendrix marketing material, First Wilson Decl., attachments to ex. B, ("Jimi Hendrix is a world-wide iconic legend. . . Jimi's name, image, and music is [sic] recognized by hundreds of millions of people throughout the world."). Defendants argue that other trademarks use the Hendrix name. Similar registrations that are in actual use in the relevant market can show a weakness in a trademark. However, Defendants have not shown that any other registrations containing the word "Hendrix" are in actual use or that they have any recognition in the relevant marketplace. These similar registrations do not indicate a weakness of Plaintiffs marks. <u>See</u> <u>AMF Inc., v. American Leisure Prods., Inc.</u>, 474 F.2d 1403, 1406 (C.C.P.A. 1973). The Court holds that the name Jimi Hendrix is a famous name and that it has acquired a secondary meaning. Accordingly, the Court holds that the Plaintiffs' incontestable Hendrix-related marks are strong marks and this factor can only support infringement.

Additionally, the AUTHENTIC HENDRIX BUST is a high-contrast black and white silhouette image with the word EXPERIENCE arched above the bust and the word HENDRIX below the bust. The arbitrary nature of this mark's features, such as text placement, artistic choices in image style, and overall feel, also make this a strong mark even apart from the strength of the secondary meaning associated with HENDRIX.

## ii. **Second Sleekcraft Factor: Proximity or Relatedness of Goods**

Goods are related if consumers are likely to associate the two products lines. <u>Surfvivor Media, Inc., v. Survivor Productions</u>, 406 F.3d 625, 633 (9th Cir. 2005). Complimentary goods, such as wine and cheese or cheese and salami, are related goods under this analysis. <u>See</u> <u>E. & J. Gallo Winery</u>, 967 F.2d at 1291; <u>White</u>, 971 F.2d at 1400 (television performances related to VCRs); <u>but</u> <u>see</u> <u>Levi Strauss & Co. v. Blue Bell, Inc.</u>, 778 F.2d 1352, 1359-60 (9th Cir. 1985) (pants and shirts are not related goods). Defendants assert that they are only selling vodka, which is not a good that is related to the types of goods Plaintiffs' marks cover, such as key chains, T-shirts, and memorabilia. However, it is undisputed that Defendants have created and distributed promotional items such as beverage glasses, T-shirts, and posters. The undisputed evidence of collisions of identical goods, such as the T-shirts distributed by both parties, clearly demonstrates that some of the products are in identical categories of goods. Defendants argue that these items are merely promotional, such as when LEXUS automobiles and LEXIS legal research services each produce T-shirts bearing their marks for promotion of their products, and like LEXUS and LEXIS, Plaintiffs' and Defendants' marks should be allowed to co-exist on promotional items. The analogy, however, does not apply to the Hendrix-related items because while items like caps and shirts may be promotional for Defendants, they are the actual products for Plaintiffs. Lexus could not produce a promotional legal research service without fear of confusing customers, just as Lexis could not produce a promotional automobile without fear of confusing customers.

Additionally in this particular case, people purchasing both Plaintiffs' and Defendants' goods are primarily motivated to purchase the goods due to the goods' relationship with Jimi

Hendrix. The goods share a defined market of Jimi Hendrix fans and are therefore in close proximity when fans search for Hendrix-related items. Defendants also argue that Plaintiffs have vowed to never produce alcohol or related products such as shot glasses or martini glasses. This is certainly Plaintiffs' stated position on alcohol-related products; however the test for relatedness of goods measures the consumer's likely association of product lines. Defendants have not produced any evidence to show that consumers are aware of Plaintiffs' position or that such awareness would prevent consumers from associating the goods.

For these reasons, the Court holds that Plaintiffs' and Defendants' goods are in close proximity and related, and this factor can only support infringement.

### iii. <u>Third Sleekcraft Factor: Similarity of the Marks</u>

When considering the similarity of marks, the marks should be evaluated as they appear in the market place as a whole and the appearance, sound, and meaning of the marks should be analyzed individually. <u>J.B. Williams Co., Inc., v. Le Conte Cosmetics, Inc.</u>, 523 F.2d 187, 192 (9th Cir. 1975); <u>Mattel, Inc. v. MCA Records, Inc.</u>, 28 F.Supp.2d 1120, 1147 (C.D. Cal. 1998).

For comparison purposes, Plaintiffs' incontestable marks and Defendants' marks fall into two categories: text marks containing the word "Hendrix," and design marks featuring images of Jimi Hendrix.

| Plaintiffs' Incontestable Text Marks | Defendants' Text Marks |
|---|---|
| AUTHENTIC HENDRIX | HENDRIX ELECTRIC |
| EXPERIENCE HENDRIX | HENDRIX ELECTRIC VODKA |
| JIMI HENDRIX | JIMI HENDRIX ELECTRIC |
| | JIMI HENDRIX ELECTRIC VODKA |

Defendants' longest mark is JIMI HENDRIX  ELECTRIC VODKA, and the other marks are shortened versions of that mark.  All of these marks share the word HENDRIX in common with Plaintiffs' marks, and two of them share the word JIMI as well.  This similarity is hardly surprising given that both Plaintiffs and Defendants seek to call to mind Jimi Hendrix, and therefore share at least that much similarity.  The primary distinguishing characteristics of Defendants' marks are the use of the word ELECTRIC and the placement of ELECTRIC after HENDRIX.  It is notable, however, that Jimi Hendrix's band was called "The Jimi Hendrix Experience," and it was actually Plaintiffs who differentiated their mark from the band name by placing EXPERIENCE before Hendrix.  Defendants' choice of placement of ELECTRIC is less distinguishing because it follows the same pattern as the original band name.  The sound of these marks is similar in that they share the same root of HENDRIX or JIMI HENDRIX and the words ELECTRIC and EXPERIENCE have similar sounds.  The appearance of these marks is similar, especially in that EXPERIENCE HENDRIX, and HENDRIX ELECTRIC have the word HENDRIX paired with an eight or nine letter word beginning with E and ending with "CE" or "IC."  The appearance of these marks is therefore similar.  The sounds, while having some specific differences, share an overall similarity.

The overall meaning of the marks is more difficult to determine; however, there is similarity between the words EXPERIENCE and ELECTRIC in that they both call to mind a distinct primary meaning and they also refer to the music of Jimi Hendrix.  EXPERIENCE is a reference to the band name, The Jimi Hendrix Experience, and ELECTRIC is a reference to the particular musical talent that made Jimi famous, his electric guitar playing in a manner completely distinct from acoustic guitar playing.  In addition, Electric is a reference to Jimi's

song "Electric Ladyland."[9]  As a whole, both Plaintiffs' and Defendants' marks primarily

convey the same impression of a musical association with Jimi Hendrix.  For these reasons,

the Court holds the text marks of Plaintiffs and Defendants are substantially similar and this

factor favors the Plaintiffs.

The design marks also share a number of similarities.

| Plaintiffs' incontestable design mark | Defendants' design mark |
|---|---|
|  |  |

Two notable similarities are immediately apparent in the appearance of the design marks:

the use of the word HENDRIX directly underneath the picture, and the rendering of the image

of Jimi in a high-contrast silhouette-like picture that is mostly black with white details.  Both

images feature Jimi's distinctive afro, although Defendants' design is a larger, older version of

Jimi's hair.  There are other differences as well.  Defendants chose to place their text

completely below the image where Plaintiffs chose to surround the image.  Defendants'

slanted and stylized text is different than Plaintiffs' block font, although both use all capitals.

Overall, however, the marks convey the same dominant impression due to the similarities of

the images, the predominant placement of the word HENDRIX, and identical references to

Jimi Hendrix.  For these reasons the design marks have an overall general similarity and this

factor weighs in favor of Plaintiffs.

---

[9] Plaintiffs also have trademark registrations for ELECTRIC LADYLAND, but this mark is not incontestable.

### iv. **Fourth Sleekcraft Factor: Evidence of Actual Confusion**

Evidence of actual confusion is persuasive evidence that future confusion is likely. <u>M2 Software, Inc. v. Madacy Entm't</u>, 421 F.3d 1073, 1082 (9th Cir. 2005). Actual confusion evidence is often difficult to obtain and its absence is often given little weight as a result. <u>Cohn v. Petsmart, Inc.</u>, 281 F.3d 837, 842-43 (9th Cir. 2002). Plaintiffs have provided emails indicating that at least some consumers were confused by Defendants' products. First Wilson Decl., ex. M. Defendants dispute whether the emailers were potential customers or people closely associated with Plaintiffs who were not confused, but were instead alerting Plaintiffs to Defendants' products. The Lee email, however, does show confusion between Plaintiffs and Defendants.[10] Defendants' argument that this email is from an associated contractor doesn't negate this evidence; in fact, the relatedness of the party to Plaintiffs only shows that even someone who is relatively familiar with Plaintiffs would be confused. This showing of actual confusion indicates a substantial likelihood of confusion and therefore infringement.

### v. **Fifth Sleekcraft Factor: Convergence of Marketing Channels**

Similarity of marketing channels can increase the likelihood that consumers will be confused. <u>AMF Inc. v. Sleekcraft Boats</u>, 599 F.2d 341, 353 (9th Cir. 1979). Both parties in this case sell their goods directly to consumers via web sites, authentichendrix.com for Plaintiffs and houseofhendrix.com for Defendants. Advertising and selling goods on the internet does not necessarily indicate similar marketing channels when almost everything is available online. Here however, the similarity of the web sites, and the chances that

---

[10] "Bob, . . . You got great PR in today's Wall Street Journal with the article on the front page about the explosion of vodka sales in the U.S. and the introduction of Hendrix Electric vodka." Wilson Decl., ex. M (email addressed to Plaintiffs from business associate).

consumers performing Jimi Hendrix related searches are likely to see both web sites, strongly indicates that the web-based marketing of both companies are related channels. Both parties also advertise in locations where Jimi Hendrix fans are likely to be exposed to the advertising because these fans are the target market for both parties. Because the marketing channels are related, this factor favors Plaintiffs.

### vi. Sixth Sleekcraft Factor: Degree of Customer Care

The degree of care customers use in a given market is a factor in determining whether the consumer will be confused by similar marks. Brookfield Communications, Inc., 174 F.3d at 1060. Plaintiffs and Defendants agree that consumers of T-shirts and ball caps are likely to exercise relatively little care, but Defendants assert that purchasers of Defendants' premium vodka are likely to exercise a higher degree of care. Purchasers of vodka products purchase them in a number of locales, including shots from the bar and bottles from the store. While full-bottle purchasers are likely to exercise more care, purchases at the bar are more likely to exercise relatively little care. However, even the more cautious shopper in this case is unlikely to use the type of care found to be relevant in other trademark cases in reducing the likelihood of confusion. Compare Sleekcraft, 599 F.2d at 353-54 (purchasers of expensive boats likely to exercise more care); with Fleischmann Distilling Corp., 314 F.2d at 161 (purchasers of alcoholic beverages would not notice small difference in labels at point of purchase). Under the facts of this case, the degree of care customers would use does not alleviate any likelihood of confusion that would arise from the similarity of the marks, and as a result, this factor cannot help Defendants.

### vii.  Seventh Sleekcraft Factor: Intent of Defendant

A defendant who knowingly crafts his mark to emulate a plaintiff's mark is presumed to have accomplished his purpose and this intent weighs heavily in favor of a plaintiff. Sleekcraft, 599 F.2d at 354.  Defendants concede they intended to create a mark that associated their goods with the persona of Jimi Hendrix.  Defendants may have believed that the Foundation Order announced an open season on Jimi's identity, but this mistaken belief does not provide them safe harbor.  Defendants admit that they were aware of Plaintiffs' marks and registrations.  Defendants also compared their design mark to Plaintiffs' while Defendants were still in the design stage and considered crafting portions of their design to look like Plaintiffs'.[11]  Defendants argue that they compared the marks in an attempt to avoid confusion, however they cite no evidence that such was the case, and at summary judgment Defendants are obligated to produce more than argument to create a genuine issue of material fact.  The intent of Defendants to emulate Plaintiffs' marks and trade off of the fame of Jimi Hendrix, a name Plaintiffs have invested with further good will after Jimi's death, strongly favors the Plaintiffs.

### viii.  Eighth Sleekcraft Factor: Likelihood of Expansion

Where there is a strong possibility of expansion into conflicting markets, this factor favors infringement.  M2 Software, Inc., 421 F.3d at 1085.  Here, Defendants admit they contemplated expansion into Plaintiffs market, licensed merchandise such as posters and T-shirts, but abandoned the expansion.  Plaintiffs admitted they have refused to enter the alcoholic beverage market or any related market.  This factor, however, is not particularly

---

[11] See First Wilson Decl., ex. E, (email to Craig Dieffenbach containing Defendants signature mark and Plaintiffs' signature mark; email from Craig Dieffenbach suggesting they make their signature look more like Plaintiffs').

relevant to the analysis at hand because the goods of both parties are already in directly conflicting areas in some cases and somewhat related and complimentary areas in others, so no further expansion is required in order for the overlapping trademarks to cause customer confusion.

### C. **Infringement Conclusion – Incontestable Marks**

Likelihood of confusion can be determined, in appropriate cases, as a matter of law at summary judgment. Murray v. Cable Nat. Broadcasting Co., 86 F.3d 858, 860-61 (9th Cir. 1996) ("Levi Strauss [& Co. v. Blue Bell, Inc., 778 F.2d 1352, 1355 (9th Cir. 1985)] does not preclude the court from determining likelihood of confusion as a matter of law, either through dismissal or summary judgment."). Although summary judgment in trademark cases is disfavored, summary judgment is appropriate when the undisputed facts lead to only one conclusion. See, e.g., Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867 (2nd Cir. 1986) (upholding grant of summary judgment in favor of mark holder on likelihood of confusion); Western Union Holdings, Inc. v. Easter Union Inc., 2008 WL 2470913 (11th Cir. 2008) (upholding grant of summary judgment in favor of mark holder on likelihood of confusion).

Consumers are accustomed to celebrity endorsements, including endorsements by the family of deceased celebrities.[12] This would be a different case were Defendants and Plaintiffs starting out at the same time and each trying to build a brand around Jimi Hendrix. In contrast, here Plaintiffs are the senior user, have incontestable marks and are a long-standing source of Jimi Hendrix related items.

---

[12] See Consuelo Lauda Kertz and Roobina Ohanian, Recent Trends in The Law Of Endorsement Advertising: Infomercials, Celebrity Endorsers And Nontraditional Defendants In Deceptive Advertising Cases, 19 Hofstra L. Rev. 603 (1991).

Defendants' opposition to summary judgment of infringement rests on the assumption that Plaintiffs' lack of ownership of any publicity rights in Jimi Hendrix limited the scope of protection they secured through their trademarks. As a matter of law, no such limitation exists and Plaintiffs have created valid trademarks that do not violate the prohibitions against misrepresentation or use of the trademarks. Plaintiffs have legally acquired the right to use Jimi Hendrix's fame to sell their products, and they are entitled to all the rights of a trademark holder. Defendants' primary opposition having failed as a matter of law, the Court has found no genuine issues of material fact remain that precludes summary judgment of infringement. Defendants have produced no evidence that any of the <u>Sleekcraft</u> factors would indicate anything other than a likelihood of confusion between Plaintiffs' and Defendants' marks. The most probative <u>Sleekcraft</u> factor applicable to this particular case is the intent of Defendants. Defendants intended to trade off the good will associated with Jimi Hendrix and intended to have a mark similar to Plaintiffs.

The Court holds that Defendants' marks create a substantial likelihood of confusion with Plaintiffs' incontestable marks. Having already held that the marks are valid and owned by Plaintiffs, the Court holds that Defendants have infringed Plaintiffs' trademark rights with respect to Plaintiffs' incontestable trademarks. The Court therefore GRANTS IN PART Plaintiffs' motion for summary judgment of infringement and holds that Defendants' marks infringe Plaintiffs' incontestable marks.[13] The Court concludes there are issues of fact relating to the contestable marks and DENIES the Plaintiffs' motion as to the contestable marks.

---

[13] Because Plaintiffs are entitled to summary judgment on the incontestable marks, the Court does not address Plaintiffs' motion with respect to the remaining marks at this time.

### III.  **Trademark Dilution**

Trademark dilution necessarily requires Plaintiffs to show that the mark is famous and distinctive. 15 U.S.C. § 1125(c)(1).  Defendants have moved for summary judgment to dismiss Plaintiffs' claims for trademark dilution.  Plaintiffs have not cross-moved for summary judgment in their favor on this issue.  Defendants contend that Plaintiffs' marks are weak and cannot be the basis for a trademark dilution action.  The Court has found that Plaintiffs' incontestable marks are strong.  The Court DENIES Defendants' motion to dismiss Plaintiffs' trademark dilution claims.

### IV.  **Contributory Infringement**

Plaintiff sues Craig Dieffenbach for contributory infringement.  Plaintiff alleges Dieffenbach is liable for direct infringement as well as for contributory infringement (Seventh Claim).  Defendant Dieffenbach moves to dismiss the seventh claim of contributory infringement.

"Contributory infringement occurs when the defendant either intentionally induces a third party to infringe the plaintiff's mark or supplies a product to a third party with actual or constructive knowledge that the product is being used to infringe the service mark." Lockheed Martin Corp. v. Network Solutions, Inc., 194 F.3d 980, 983 (9th Cir. 1999). Defendant Dieffenbach has moved for summary judgment to dismiss Plaintiffs' contributory infringement claims.  Plaintiffs have not cross-moved for summary judgment on this issue.  It is not disputed that Mr. Dieffenbach personally registered the marks at issue, and he also controls Defendants.  Any infringement that Electric Hendrix engages in at Mr. Dieffenbach's direction would give rise to contributory infringement.  Wilson Decl., ex. G at 187:15-21

("[L]ike I said, I'm the decider.").  As such, the Court DENIES Defendants' motion to dismiss Plaintiffs claims for contributory infringement.

## V. <u>Damages</u>

Defendants assert that there are no damages in this case because the products of Defendants and Plaintiffs do not compete.  This argument is without merit for the reasons stated in this Order.  The Court DENIES Defendants' motion for summary judgment that there are no damages.

## VI. <u>Posture of the Case</u>

Plaintiffs Amended Complaint alleges claims for federal trademark infringement, common law trademark infringement, unfair competition, trademark dilution by blurring, trademark dilution by tarnishment, violations of the Washington State Consumer Protection Act, contributory infringement, unjust enrichment, and constructive trust.  This Order grants summary judgment in favor of Plaintiffs as to the infringement of the incontestable marks alleged in the first claim.  Plaintiffs have not moved for summary judgment on their remaining claims.

Defendants' answer alleges three counterclaims.  The first counterclaim alleges that Plaintiffs do not have rights in the trademarks they are asserting as a result of alleged fraud on the PTO, and the Court has held in this Order that this counterclaim is dismissed as to all of Plaintiffs' marks.  The second counterclaim alleges that Plaintiffs abandoned their trademark rights, and the Court has held in this Order that this counterclaim is dismissed as to all of Plaintiffs' marks.  The third counterclaim alleges that Plaintiff's marks are not used as trademarks but as rights of publicity, and the Court has held in this Order that this counterclaim is dismissed as to all of Plaintiffs' marks.

The parties are directed to file a status report within 30 days of this Order outlining the claims that remain for trial, the parties' estimates of the time required for trial, and when the parties will be prepared to proceed to trial.

**VII.     Injunction**

Plaintiffs are directed to file a proposed permanent injunction consistent with this Order by August 22, 2008.  Defendants may file any objections to the proposed injunction by September 5, 2008.  No reply should be filed by Plaintiffs unless requested by the Court.  The Court will enter an injunction consistent with this Order after reviewing the parties' submissions.

# CONCLUSION

The Court DENIES Defendants' Motion for Summary Judgment, docket no. 64.  The Court GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Partial Summary Judgment, docket no. 71, and GRANTS Plaintiffs' Motion for Summary Judgment dismissing counterclaims, docket no. 73.

IT IS SO ORDERED.

DATED this 7th day of August, 2008.

s/ Thomas S. Zilly

_____

THOMAS S. ZILLY
United States District Judge